UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BARBARA J. BRACCI,

                                            **Plaintiff**,

   -against-                                                                           3:01-CV-01300

N.Y.S. DEPARTMENT OF CORRECTIONAL
SERVICES; GLENN GOORD, Commissioner,
N.Y.S. DOCS, Individually and as
Commissioner of DOCS; GARY FILLION,
Superintendent of Summit Correctional
Facility; THOMAS TESTA, Director of
Office of Employee Relations; and
WILLIAM PEEK,

                                            **Defendants**.
_____

**THOMAS J. McAVOY,**
**Senior United States District Judge**

**DECISION & ORDER**

**I. INTRODUCTION**

      Plaintiff commenced this action asserting that she was subjected to a sexually hostile work environment and *quid pro quo* sexual harassment during her employment as a corrections officer working for the New York State Department of Correctional Services ("DOCS") at the Summit Correctional Facility ("Summit"), and that she was constructively discharged. <u>See generally</u> Compl.

[dkt # 1]. Her claims are brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); 42 U.S.C. §§ 1981, 1983, and 1985; and, the New York State Human Rights Law, N.Y. Exec. Law § 296, *et seq.* ("NYSHRL"). Id.; see dkt. # 110. Defendants answered, and Defendant William Peek filed several state-law counterclaims against Plaintiff. See First Amend. Answer and Counterclaims, dkt. # 17. Following a lengthy and acrimonious period of discovery, Defendants moved for summary judgment. After Defendants filed their motion, Plaintiff withdrew her claims under 42 U.S.C. §§ 1981, 1983, and 1985. See dkt. # 110. Accordingly, those claims are dismissed. Plaintiff has opposed the motion with regard to the remaining claims. For the reasons that follow, Defendants' motion for summary judgment is GRANTED.

## II. STANDARD OF REVIEW

The Court will apply the well-settled standard for deciding summary judgment motions in discrimination actions. See FED. R. CIV. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). While this standard need not be repeated in every decision, certain parts need to be stressed in this case.

On a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), cert. denied, 529 U.S. 1098 (2000), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232,

236 (1974).

The Second Circuit has cautioned that on a motion for summary judgment, "especially in the context of a claim of discrimination, the court should not view the record in piecemeal fashion." Fitzgerald v. Henderson, 251 F.3d 345, 360 (2d Cir. 2001). Further, where the intent of one party is in question, as is often the case with employment discrimination claims, the "court must be cautious about granting summary judgment." Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994).

However, "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). "Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, (2d Cir. 2001). The "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Inadmissible hearsay may not be used to oppose (or to support) a motion for summary judgment, Sarno v. Douglas Elliman- Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999), and a party may not create a question of fact by submitting an affidavit that contradicts that party's prior sworn statement. See Rubens v. Mason, 387 F. 3d 183, 192 (2d Cir. 2004).[1] Consequently, summary judgment, even in a discrimination case, may be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."

---

[1] This rule would prevent a party from contradicting his or her own sworn statement in a multi-part deposition where, for instance, the party testifies one way about a particular issue and then, at a later date but during the continuation of the same deposition, the party testifies another way about the same issue.

3

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); see Reeves v. Sanderson Plumbing Prods., Inc., 120 S.Ct. 2097, 2109 (2000)(the Supreme Court "reiterated that trial courts should not 'treat discrimination differently from other ultimate questions of fact.'")(quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 524 (1993)).

Finally, it must be stressed the Court's Local Rules require the parties "to clarify the elements of the substantive law which remain at issue because they turn on contested facts" and the Court "is not required to consider what the parties fail to point out." Monahan v. New York City Dep't of Corrections, 214 F.3d 275, 291 (2d Cir. 2000)(internal quotation marks and citations omitted). It is the duty of the attorneys to sift through the record and bring to the Court's attention the pertinent information that may create a triable issue of fact. See Amnesty America v. Town of West Hartford, 288 F.3d 467, 470 (2d Cir. 2002)("We agree with those circuits that have held that FED. R. CIV. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.")(citations omitted). While a party may contend that admissible proof of a contested material fact exists *somewhere* in the record, the Court will not consider such a contention unless a specific citation to the record is supplied. Id.

**III. FACTUAL BACKGROUND**

The following facts are taken from the parties' Local Rule 7.1 Statements or other admissible proof specifically cited by the parties. The facts are considered in the light most favorable to Plaintiff, and the Court draws all reasonable factual inferences in her favor. See Abramson v. Pataki, 278 F.3d 93, 101 (2d Cir. 2002). Only those facts material to the Court's determination are set forth below.

Plaintiff was employed by DOCS as a Corrections Officer from June 1983 until October 20, 1996. From approximately 1988 until October 20, 1996, she was assigned to work at Summit. Plaintiff asserts that she was subjected to a hostile work environment by the actions of fellow Corrections Officer Tab Nickels, and other officers as Summit.  In this regard, in the summer of 1988 or 1989 Plaintiff began a consensual relationship with Nickels, a person not named as a defendant in this action. Plaintiff alleges that during the course of this relationship, Nickels stole a video tape of Plaintiff engaging in "intimate sexual activities" with a man with whom she had formerly had a long-term relationship.[2]  Plaintiff believes, although she has no first hand knowledge of the fact, that Nickels brought this video tape to Summit and displayed it to the corrections staff while she was out of work on disability in 1993. Def. L. R. 7.1 Stat. ¶ 33.

During their relationship, Plaintiff also made at least one sexually explicit video tape with Nickels that she gave to him. After Plaintiff's relationship with Nickels ended in 1992, Nickels showed this video tape (and possibly others) to other corrections officers. Plaintiff asserts that after Nickel's showed the video tapes to Summit staff members, she began to be sexually propositioned by various staff members. See Compl. ¶ 14.  She further claims that when she refused these propositions, she was retaliated against by such actions as abusive comments and unwarranted discipline. Id.  One such instance was a Notice of Discipline which Plaintiff was served with on June 2, 1994 ("June 2, 1994 NOD"). Id. ¶ 15.  The June 2, 1994 NOD charged Plaintiff with leaving her post while on duty at Summit on April 19, 1994, and with falsifying a report to the facility Superintendent regarding the incident.  The NOD sought Plaintiff's discharge as a sanction.

---

[2] Nickels denies stealing the video tape.

Plaintiff's testimony as to when she learned of Nickels' purported conduct in showing the video tapes, and when he was showing the tapes, is unclear. She testified first at her deposition that she learned that Nickels was showing the videos in early January 1996 after the events with Defendant William Peek (discussed next) "came to a head." Bracci Dep., Vol I at 130:15-133:2. However she also testified in her deposition that she had "heard that [the videos] were out there," and "had reason to believe in 1995 that [they were] being shown by [Nickels] to other officers." Bracci Dep., Vol III, 440:8-441:20; 445:24-446:6; 457:11-457:1. Plaintiff has admitted in her Local Rule 7.1 Statement that in 1995 (1) she had reason to believe that Nickels was showing the tapes to other officers,[3] and (2) she was advised by Peek that she should file a complaint with DOCS' Office of Affirmative Action regarding the tapes. Def. L.R. Stat. ¶¶ 83-84; see also Bracci Dep., Vol III at 443:1-7, and Ex. 23 (side B approx. 5.2 min to 7.6 mins.).[4]

Nonetheless, despite that (1) Plaintiff was aware of DOCS' anti-harassment policy and the procedures for filing a complaint of workplace harassment, Bracci Dep., Vol. I 76:5-81:3; 133:21-134:2; and (2) Plaintiff had previously filed at least one complaint of sexual harassment with DOCS' Affirmative Action Office, id. 134:9-135:2; Jones Dep. 6:8-7:24; Fillion Dep. 14:1-16:6, Plaintiff never filed a complaint with the employer regarding Nickel's purported conduct.

Plaintiff also asserts that she was subjected to *quid pro quo* sexual harassment by Defendant

---

[3] It is difficult to understand how the showing of the video tapes in 1995 or 1996 influenced other corrections officers' actions in 1994.

[4] Exhibit 23, side B, is an audio tape that Plaintiff covertly made of a telephone conversation she had with Defendant William Peek in 1995. During the call, Plaintiff can be heard discussing with Peek her "belief" that the video tapes of her engaging in sexual activities "were out there" and being viewed by the other Corrections Officers. Peek can be heard discussing the filing of a complaint with DOCS' Office of Affirmative Action, but the conversation sounds to be merely a follow up to a previous discussion about the tapes. Nonetheless, Plaintiff admitted through the Local Rules Statements that Peek advised her to file a complaint with DOCS' Office of Affirmative Action.

Peek. In this regard, shortly after Plaintiff received the June 2, 1994 NOD, Peek was assigned as the Corrections Captain at Summit and became Plaintiff's supervisor. Peek learned of the troubles that Plaintiff was having with the other officers and that she had been served with the June 2, 1994 NOD. Even though Peek did not issue the NOD, he told Plaintiff that, if she engaged in a sexual relationship with him, he would "make the [June 2, 1994 NOD] go away" and would stop the other corrections officers from harassing her. See Compl. ¶ 15. Plaintiff unwillingly capitulated to Peek's demands and commenced a sexual relationship with him that last from October 1994 until December 1995. Def. 7.1 Stat. ¶ 50. During this period, Plaintiff asserts that Peek forced her to engage in repeated non-consensual sexual acts.

Sometime before April 27, 1995 (Peek's birthday), Plaintiff consulted with an attorney regarding Peek's conduct in forcing her to engage in unwelcome sexual relations. The attorney supposedly told Plaintiff to continue her relationship with Peek; to tape-record her conversations and encounters with Peek to gain evidence against him; to "go along with what [Peek] did;" and to keep a diary of Peek's demands and her sexual encounters with him. Def. 7.1 Stat. ¶¶ 110-112. Plaintiff did so and continued the relationship with Peek, even making two video tapes of herself masturbating alone in her bedroom and giving them to Peek as a birthday present.[5]

Plaintiff asserts that Peek's conduct stopped sometime in December of 1995 after she refused Peek's instruction to have sex with Peek's 16-year old son. See Compl. ¶ 18; Def. L.R. 7.1

---

[5] Plaintiff made a video tape of herself masturbating and gave it to Peek for his birthday. However, Peek purportedly did not like what Plaintiff was wearing in the video and told her to make a second video, which she did. See Def. L.R. 7.1 Stat. ¶¶ 114-120. Plaintiff also admits in her Local Rule 7.1 Statement that the attorney who advised her to continue the relationship with Peek was also "arranging for plaintiff and Peek to engage in a three-way sexual encounter with another of [the attorney's] clients or acquaintances, which was being arranged to celebrate Peek's birthday." Def. L.R. 7.1 Stat. ¶ 112.

Stat. ¶ 50. At about this same, Plaintiff contends that she was subjected to unwarranted disciplinary action by Peek.  When this occurred, Plaintiff told two DOCS employees that she had been forced by Peek to engage in unwanted sexual relations.  One employee, in turn, advised Superintendent Gary Fillion of the allegations, and then forced Plaintiff to call the Superintendent.  On January 2, 1996, Plaintiff called Superintendent Gary Fillion and met with him on January 4, 1996 at which time she asserted that Peek was sexually harassing her.  At the meeting, Plaintiff played two audio tapes for Fillion that Plaintiff recorded during sexual encounters with Peek. See Bracci Dep. Vol. III, 312:11-313:16; 314:12-317:9. Fillion ordered Plaintiff to "put something in writing" regarding her complaint (which she never did). See Def. L.R. 7.1 Stat. ¶ 61. Immediately after the meeting, Fillion called DOCS' Deputy Commissioner Phillip Coomb and advised him of the nature of Plaintiff's allegations. On the same day, Fillion forwarded the two audio tapes to DOCS' Office of Affirmative Action.

At about the same time, Plaintiff called Investigator Michael Tighe of the New York State Attorney General's Office and made a similar complaint.[6] On January 5, 1996, Inv. Tighe telephone DOCS' Deputy Inspector General George Seyfert and communicated to him the nature of Plaintiff's allegations regarding Peek. Seyfert interviewed Plaintiff the same day.  Subsequently, an investigation was opened by DOCS' Inspector General, its Office of Affirmative Action, and its Bureau of Labor Relations.

Plaintiff contends that on January 4, 1996, the June 2, 1994 NOD was "reactivated" and scheduled for a hearing. See NYSDHR Compl. ¶ 3 (Def. Ex. B); Compl. ¶ 18. Plaintiff argues that

---

[6] Defendants contend that Plaintiff telephoned Investigator Tighe only after she had been given a direct order to do so.

the "reactivation" of the June 2, 1994 NOD was a form of retaliation for having complained of sexual harassment. She further argues, albeit without factual support, that Peek used his influence to "reactivate" the June 2, 1994 NOD. However, the uncontradicted facts indicate that the prosecution of the NOD was never "deactivated," but rather proceeded to final arbitration according to standard procedure, albeit with a few delays caused by Plaintiff. See Testo Dep. 9-44.[7]

On January 16, 1996, Plaintiff meet with DOCS' Ins. General Brian Malone, Donna Masterson (a representative of DOCS' Office of Affirmative Action), and Thomas Testo (a representative of DOCS' Bureau of Labor Relations). During the course of the investigation, Peek and other DOCS employees were interviewed. At the close of the investigation, it was determined that Plaintiff had engaged in purely consensual relationship with Peek and, therefore, her claims of harassment were deemed unfounded. However, it was determined that by engaging in a consensual relationship with a subordinate, Peek had compromised his ability to supervise the correctional staff at Summit. Accordingly, on January 22, 1996, Peek was transferred to Sing Sing Correctional Facility and Plaintiff had no further contact with him in the workplace. Bracci Dep. 319:14-17.

On February 20, 1996, Plaintiff filed criminal charges of Rape, Sodomy and Aggravated Sexual Abuse against Peek. Apparently, the police found insufficient probable cause to prosecute these charges. The Counterclaims asserted in this action are state law claims brought by Peek based

---

[7] The arbitration hearing in this matter was originally set for April 13, 1995, but adjourned at the request of Plaintiff's union, Council 82. See January 20, 1995 letter from Arbitrator Prosper, Def. Ex. 11, at ODM-3. The matter was then scheduled for an arbitration hearing on February 29, 1996, but again adjourned because Plaintiff "fired" the Union and hired a private attorney. Id. at ODM-2. It may very well have appeared to Plaintiff that, during the period from June 2, 1994 until at least January of 1995, Defendant Peek was using his influence to "make the [NOD] go away." However, Defendants have supplied uncontradicted testimony from Thomas Testo, a representative of DOCS' Bureau of Labor Relations who issued the June 2, 1994 NOD, that he had no discussions with Peek regarding the handling of the NOD, that the NOD proceeded according to standard procedure, and that if Plaintiff felt that her rights were violated due to an undue delay in prosecuting the NOD she could have raised that with arbitrator - which she did not. See Testo Dep. 9-44.

upon these failed criminal charges. See Amend. Ans. ¶¶ 26-85 [dkt. # 17].

On October 20, 1996, Plaintiff tripped over a floor mat, herniated a cervical disk, and went out on disability due to the physical injuries from the fall. Bracci Dep. Vol. I at 26:11-27:12; 137:20-138:4; 189:5-10: 190:22-191:5. Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") on November 4, 1996, asserting that she had been "sexually harassed by [her] Captain, William Peek" since October of 1994 when he forced her into a sexual relationship as a *quid pro quo* for taking care of the June 2, 1994 NOD. See NYSDHR Compl. ¶ 2. Plaintiff further alleged in the NYSDHR complaint that she reported Peek's unlawful conduct to DOCS' "EAP"[8] in October 1995, to "the union" in November, 1995, and to the Superintendent on January 2, 1996. Id. ¶ 3; see Def. L.R. 7.1 Stat. ¶ 87.[9]

Plaintiff contends that in February of 1997, while she was still out on disability leave, she applied for a transfer to the Woodbourne Correctional Facility. See Plf. Mem. L, in Opp., p. 15; Bracci Dep. Vol III, pp. 504-506. She purportedly was "warned" that "the facility was aware of what she had done at Summit, that she was a troublemaker, that they would be watching her, and that they would not put up with anything from her at Woodbourne." Plf. Mem. L, in Opp., p. 15; see Bracci Dep. Vol III, pp. 504-506. Bracci "took this to mean that the hostile environment and retaliation would follow her, and continue and that she was constructively discharged." Plf. Mem. L, in Opp., p. 15; see Bracci Dep. Vol III, pp. 504-506.

---

[8] The Court presumes that the "EAP" is the Employee Assistance Program.

[9] Plaintiff asserts in her NYSDHR Complaint that, on January 4, 1996, the June 2, 1994 NOD was scheduled for a hearing. Id. However, the NYSDHR Complaint does not mention harassment caused by Nickel's showing of the video tapes to co-workers, or of the imposition of discriminatory discipline (other than the scheduling of the June 2, 1994 NOD for a hearing). Plaintiff asserts, however, that the issue of Nickel's conduct was brought up in the NYSDHR proceedings and, therefore, Defendants had sufficient notice of the claim.

On June 28, 1997, an arbitration hearing was held regarding the June 2, 1994 NOD. On October 20, 1997, after being out on Workers' Compensation for one year, and it appearing that Plaintiff could not return to her job, her employment with DOCS was terminated. Bracci Dep. Vol. I at 26:11-27:12; 137:20-138:4; 189:5-10: 190:22-191:5.[10] On March 27, 1999, an Opinion and Award was issued on the June 2, 1994 NOD. Plaintiff was found guilty of all charges, and she was suspended for three months without pay. However, DOCS agreed not to take disciplinary action because, at the time, Plaintiff had already left DOCS' employment. Bracci Dep. Vol. I at 190:22-191:5. Plaintiff commenced the instant action on August 17, 2001. See Dkt. # 1.

## IV. THE COMPLAINT

There is a dispute as to what claims are now before the Court. With regard to Title VII, the Complaint alleges only claims for sexual harassment (First Cause of Action).[11] Given the factual allegations in the Complaint, the sexual harassment could either be the hostile work environment created by Nickels or the quid pro quo harassment perpetrated by Peek, or both. To the extent Plaintiff attempts to raise, for the first time in her Memorandum of Law in Opposition to Summary Judgment, *independent* claims of sexual harassment against non-defendant DOCS employees for conduct that took place in April 1994,[12] those claims are not considered in this action. See Kearney

---

[10] Plaintiff testified that her symptoms from her physical injuries have never improved and she has not been employed since October of 1996. Bracci Dep. Vol. I at 26:11-27:12; 137:20-138:4; 189:5-10: 190:22-191:5. Since her departure from DOCS in October 1996, Plaintiff has continued to receive approximately $4,087 per month in disability benefits from DOCS, Social Security, and the New York State Insurance Fund. Bracci Dep., Vol. I 27:16-29:4.

[11] Plaintiff also contends that she was constructively discharged by the employer's failure to curb the harassment in the workplace, see Compl. ¶ 19, and therefore the constructive discharge contention is properly before the Court as part of the sexual harassment claims.

[12] The Court will consider the purported conduct by these non-defendant employees to the extent it is relevant to the hostile work environment that was asserted in the Complaint.

11

v. County of Rockland, 373 F. Supp.2d 434, (S.D.N.Y. 2005)(District Court would not consider employee's hostile work environment claim under Title VII, where claim was raised for first time in employee's memorandum of law opposing employer's motion for summary judgment, and was not included in her complaint or her EEOC charge.).[13]

Plaintiff also asserts, in her Memorandum of Law, independent claims of unlawful Title VII retaliation. However, there is no mention in the Complaint of any claim of unlawful retaliation, nor are there any facts asserted in the Complaint that would support such a claim or put defendants on notice of these claims. See Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005);[14] see also Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514 (2002).[15]  Despite that this case has been pending for more than three years, Plaintiff has made no attempt to amend the Complaint to assert a Title VII retaliation claim. See dkt. 110 (requesting leave to amend, but only to add a NYSDHR sexual harassment claims). Therefore, the Court will not consider independent Title VII retaliation

---

[13] Kearney cites the following cases: Southwick Clothing LLC v. GFT (USA) Corp., No. 99 Civ. 10542, 2004 WL 2914093, **6-7, 2004 U.S. Dist. LEXIS 25336, at *20-21 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered...."); Rochester v. Blue Cross & Blue Shield, No. 98 Civ. 2436, 2000 WL 1052064 *6, 2000 U.S. Dist. LEXIS 10550, at *17-18 (S.D.N.Y. June 30, 2000); Beckman v. U.S. Postal Serv., 79 F. Supp.2d 394, 408 (S.D.N.Y.2000) (noting that claims not pleaded in the complaint will not be considered in opposition to summary judgment); Bonnie & Co. Fashions, Inc. v. Bankers Trust Co., 170 F.R.D. 111, 119 (S.D.N.Y.1997) (noting that "it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment").

[14] The establish a claim for unlawful retaliation under Title VII, an employee must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity;  (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." Jute, 420 F.3d at 173 (quoting McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001)).

[15] In Swierkiewicz, the Supreme Court rejected this Circuit's practice of requiring a complaint to allege a *prima facie* case of discrimination to survive a motion to dismiss. Swierkiewicz, 534 U.S. at 508-14. The Court held that such a "heightened pleading standard in employment discrimination cases conflicts with Federal Rule of Civil Procedure 8(a)(2), which provides that a complaint must only include 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" Id. at 512 (quoting FED. R. CIV. P. 8(a)). "This simplified notice pleading relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. Thus, a complaint is sufficient if it gives the defendant fair notice of the plaintiff's claims, the grounds upon which they rest, and states claims upon which relief could be granted. Id. at 514.

claims.

Finally, there is a dispute whether Plaintiff has asserted hostile work environment and quid pro quo sexual harassment claims under New York's Human Rights Law ("NYHRL"). The jurisdictional statement in the Complaint asserts that "[b]oth state and federal claims are presented herein which arise from a common nucleus of operative fact." Compl. ¶ 2. Inasmuch as Title VII and NYHRL sexual harassment claims are governed by substantially the same substantive standard, see Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005)(analyzing NYSHRL claims using the same analytic framework used in Title VII cases); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998)(The New York courts "require the same standard of proof for claims brought under section 296 of the Human Rights Law as for those brought under Title VII."); EEOC v. Rotary Corp., 297 F. Supp.2d 643, 661 (N.D.N.Y. 2003)("Title VII and the New York State Human Rights Law employ an identical standard to determine if the substantive elements of a hostile work environment/sexual harassment claim have been proven."), the Complaint satisfies the minimal pleading requirement of Fed. R. Civ. P. 8 such that the Court will consider that a sexual harassment claim is asserted under the NYHRL.

**V. DISCUSSION**

   **A. Statute of Limitations - Title VII**

Defendants argue, *inter alia,* that all Title VII claims are barred because Plaintiff failed to timely file her administrative claim. An aggrieved employee wishing to bring a Title VII claim in a district court for conduct that occurred in New York must file an administrative complaint with the Equal Employment Opportunity Commission or the NYSDHR within 300 days of the alleged

13

discriminatory act. Petrosino v. Bell Atlantic, 385 F.3d 210, 219 (2d Cir. 2004); Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 133 (2d Cir. 2003)(citing 42 U.S.C. § 2000e-5(e)).  As indicated above, Plaintiff filed her discrimination charge with the NYSDHR on November 4, 1996. Thus, the limitations period for her Title VII claims began 300 days earlier, on January 9, 1996. See Petrosino, 385 F.3d at 219.

The Court will first address the "hostile work environment" sexual harassment claim that arose because of Nickel's showing of the various video tapes.

> When ... a plaintiff's allegations of discrimination extend beyond the 300-day limitations period, the nature of the claim determines what consideration will be given to the earlier conduct.  For example, in the case of a hostile work environment claim, the statute of limitations requires that only one sexually harassing act demonstrating the challenged work environment occur within 300 days of filing; once that is shown, a court and jury may consider "the entire time period of the hostile environment" in determining liability. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Petrosino, 385 F.3d at 220. By the same reasoning, however, discrete acts of discrimination occurring outside the Title VII's 300-day limitations period are not actionable on the theory that a different act of discrimination occurred within the limitations period. Morgan, 536 U.S. at 114-15.

With regard to Nickel's conduct showing the sexually explicit video tapes and the workplace harassment that supposedly arose therefrom, there is no evidence that any acts of such harassment extended into the 300-day limitations period. By Plaintiff's own allegations, once Defendant Peek became Captain at Summit and started his own discriminatory practice (discussed *infra*), he acted to stop the harassment by the other corrections officers. See Compl. ¶¶ 14, 15, 16.

Plaintiff's argument that Peek's conduct constituted part of a "continuing violation" that

started with Nickel's workplace harassment is unavailing. Under Title VII's continuing violation doctrine, "if a plaintiff has experienced a continuous practice and policy of discrimination, ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Fitzgerald v. Henderson, 251 F.3d 345, 359 (2d Cir. 2001)(internal quotation marks and citations omitted). "The continuing violation doctrine allows all claims resulting from a discriminatory policy or practice to be considered timely, even if untimely standing alone." Plumey v. New York State, 2005 WL 1412962, at * 5 (June 15, 2005)(citing Cornwell v. Robinson, 23 F.3d 694, 704 (2d Cir. 1994).

Conduct that has been characterized as a continuing violation is "composed of a series of separate acts that collectively constitute one unlawful employment practice." Morgan, 536 U.S. at 111 (internal quotation marks omitted); Elmenayer v. ABF Freight Sys., Inc., 318 F.3d 130, 134 (2d Cir. 2003). In order to assert a continuing violation, a plaintiff must establish both (1) a policy or practice which caused the alleged discrimination, and (2) that the timely claim is continuous in time with the untimely claims. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 766 (2d Cir. 1998). However, "[a]s a general rule, courts in the Second Circuit have viewed continuing violation arguments with disfavor." Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 82 (2d Cir. 2001). "Indeed, only 'compelling circumstances will warrant application of the exception to the statute of limitations.'" See Quadrozzi Concrete Corp. v. City of New York, 2004 U.S. Dist. LEXIS 19880, *25 (S.D.N.Y.2004)(quoting McMillian v. City of New York, 1997 U.S. Dist. LEXIS 14312 (S.D.N.Y. Sept. 19, 1997), aff'd, 1998 U.S.App. LEXIS 12949 (2d Cir. May 29, 1998)).

In the instant case, there was no continuous policy or practice that ran from Nickel's showing of the video tapes into the limitations period. As Plaintiff alleges, in October 1995 Peek

intervened and (1) stopped the harassment by co-corkers that arose because of Nickel's conduct, and (2) insulated Plaintiff from unwarranted discipline by others at Summit (at least while the "relationship" was ongoing between Peek and Plaintiff). While Peek might have been merely seizing upon the situation to commence his own illegal harassment, his conduct served to stop the workplace harassment supposedly brought about by Nickel's conduct. Unlike in Fitzgerald, Plaintiff's allegations of workplace harassment do not present a "constant stream" of "almost daily abuse" with "no interruption" that continued from Nickel's conduct into the limitations period. See Fitzgerald, 251 F.3d at 363.

There is no merit to Plaintiff's assertion that the "re-activation" of the June 2, 1994 NOD constituted a continuation of the prior harassment started by Nickels. As indicated above, other than Plaintiff's conclusory allegation, there is no proof that the NOD was ever "deactivated," and, therefore, the discriminatory impact of the NOD occurred in 1994. See Washington v. County of Rockland, 373 F.3d 310, 318 (2d Cir. 2004).[16]

Further, and assuming *arguendo* that the June 2, 1994 NOD was reactivated, the argument of a continuous violation must fail for three additional reasons. First, Plaintiff alleged in her NYSDHR complaint that the NOD was reactivated on January 4, 1996. This was before the 300-day time

---

[16] In Washington, the Second Circuit rejected a "continuous violation" theory by plaintiffs who contended that the defendant's decision to prosecute weak, previously filed disciplinary charges constituted a part of continuous violation sufficient to bring plaintiffs' otherwise untimely racial discrimination claims into the limitations period. In rejecting the "continuous violation" theory, the Circuit Court held:

> Here, the conduct in question was [defendant'] decision to file disciplinary charges against plaintiffs. Such conduct is clearly a single act, discrete in its nature. Although [defendant] could have revisited its decision after the charges had been filed, doing so would not have turned the act of filing the charges into a continuous or ongoing policy or practice. The alleged discrimination occurred when [defendant] undertook the individual act of initiating disciplinary charges against each plaintiff.

373 F.3d at 318 (emphasis added).

16

period and, thus, cannot "save" the untimely hostile work environment claim. Second, even if reactivated within the time period, the complained-of-harassment (a hostile work environment brought about by Nickel's showing the video tapes) and the "reactivation" of the NOD were separated by 18 months. The conduct is hardly "continuous." Third, Plaintiff asserts that the "reactivation" was caused by Peek. Thus, assuming this to be true, it could not have been the continuation of practice of harassment caused by Nickels, but instead was a form of retaliation by Peek. See Washington, 373 F.3d at 318 ("Because [defendant's] prosecution of the charges to ultimate disposition is wholly separable from the act of initiating the charges, we reject plaintiffs' contention that this series of separate acts should be characterized as an ongoing policy of continuous discrimination sufficient to toll the applicable statute of limitations.").

Similarly, Plaintiff's allegations of co-worker harassment after she ended her relationship with Peek, apart from being wholly conclusory, does not establish a *continuous* course of conduct from the previous harassment such to bring the claim into the limitations period.[17] There is no evidence to indicate that any workplace harassment Plaintiff might have suffered after December of 1995 was, in any way, related to the harassment she was subjected to before October of 1994, or that there was a constant barrage of such conduct after December of 1995.

Finally, Plaintiff's allegations of a "constructive discharge" supposedly occurring in 1997 are insufficient to save the hostile work environment claim. While a constructive discharge could be the penultimate act in a continuing pattern or practice of discrimination, here there is no factual

---

[17] Plaintiff asserts in her Memorandum of Law, without citation to any portion of the record, that in October of 1996, she an another Corrections Officer got into an argument and both were issued "counseling memos." She further asserts in her Memorandum of Law, again without reference to any portion of the record, that in February of 1997, she received a Notice of Discipline for the "October 1996 incident." There is not indication as to what happened to this NOD.

basis to conclude that a constructive discharge occurred. An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that she is forced to quit involuntarily. Petrosino, 385 F.3d at 229 (citation and quotation marks omitted). Plaintiff has not provided any factual details that would demonstrate that a constructive discharge occurred. Assuming the employer told Plaintiff that it was going to watch her, there is no basis upon which a fact finder could reasonably conclude that, *if she came back to work*, the working atmosphere would have been intolerable.

Further, Plaintiff testified that she never regained the physical ability to return to work following her October 1996 fall. Inherent in a constructive discharge allegation is the belief that, but for the employer's conduct, the employee would have stayed on the job. By Plaintiff's own admission, her employment ended on October 20, 1996 and she was, and still is, physically incapable of performing her job. Thus, she cannot assert that she was constructively discharge, and, therefore, she cannot use a constructive discharge as a discriminatory act occurring within the limitations period.

Moreover, and assuming that Plaintiff was constructively discharged when she sought to transfer, and assuming further that Peek's conduct was part of the pattern or practice of discrimination that Plaintiff endured, there was not a continuous course of conduct from the end of Peek's conduct in December 1995 to February of 1997. At most, Plaintiff cites to one or two isolated events after January of 1996 that she claims was harassing. These do not satisfy the continuing violation doctrine and cannot save the hostile work environment claim. Accordingly, the claim asserting a hostile work environment premised upon, or arising from, Nickel's showing of sexually explicit videos, is time barred.

Turning to Plaintiff's claim of *quid pro quo* sexual harassment perpetrated by Peek, there is no dispute that the sexual conduct with Peek ended in December 1995. Thus, unless there is some conduct bringing this claim into the limitations period, this claim is also time barred. Again, Plaintiff argues that the reactivation of the NOD is an event that brings the claim into the limitations period. However, as discussed above, there is no evidence to supports the proposition that the June 2, 1994 NOD was ever de-activated. Further, assuming that it was "reactivated," it was reactivated before the 300 time period. Finally, Plaintiff presents nothing more than bald, conclusory allegations that Peek had anything to do with the NOD being "reactivated." Thus, even if the NOD was reactivated, it cannot be used to save the *quid pro quo* sexual harassment claim.

As to other acts of harassment endured by Plaintiff after January 9, 1996, none are alleged to have occurred while Peek was still at Summit. Further, there is no evidence that would tie him, or his purported harassment, to this conduct or the purported constructive discharge. Thus, the continuing treatment violation doctrine provides Plaintiff no help in attempting to save the *quid pro quo* sexual harassment claim for the time bar.

Consequently, the Court finds that all of Plaintiff's Title VII claims are time barred and must be dismissed. The Court, therefore, declines to reach the other grounds for dismissal.

### B.  NEW YORK STATE CLAIMS

All federal claims having been dismissed, and there being novel, complex, and unsettled issues of state law related to the question of whether the statutes of limitation for the state law claims and counter-claims were tolled while Plaintiff pursued her administrative remedy before the NYSDHR, see LaMere v. N.Y.S. Office for the Aging, 2005 WL 1174068, at * 16 (April 27,

2005)("Courts in the Second Circuit are split on whether the statute of limitations with respect to a state law claim is tolled when a state claim arises from the same set of facts as a Title VII claim timely filed with the NYSHRL or the EEOC.")(quoting Duran v. Jamaica Hospital, 216 F. Supp.2d 63, 67 (E.D.N.Y. 2002)(citing cases)); Plumey v. New York State, 2005 WL 1412962, at * 4 ("The state law where a federal court sits determines the tolling of the statute of limitations." ), the Court declines to exercise its discretion to maintain jurisdiction over the remaining state law claims. See 28 U.S.C. § 1367(c)(3); Purgess v. Sharrock, 33 F.3d 134, 138-39 (2d Cir. 1994).  Therefore, all state law claims and counter-claims are dismissed without prejudice to refiling in state court.

## VI. CONCLUSION

For the reasons discussed above, the Defendants' motion for summary judgment is **GRANTED**, and all federal claims are **DISMISSED WITH PREJUDICE**. The Court declines to exercise jurisdiction over the supplemental state law claims and counter claims, and all state law claims and counterclaims are **DISMISSED WITHOUT PREJUDICE TO REFILING IN STATE COURT.**

**IT IS SO ORDERED**.

DATED:   September 30, 2005

_Thomas J. McAvoy_
Thomas J. McAvoy
Senior, U.S. District Judge